Good morning, Your Honors. I'm William Frick for Adan Guzman-Hernandez. I'm William Frick for Adan Guzman-Hernandez. I'm sorry, I can't hear you. I'm William Frick for Adan Guzman-Hernandez. Yes. We believe there are four main issues in this case. Has there been past persecution? Is Mr. Guzman-Hernandez... I understand that you're having problems speaking, but could you try and talk into the mic, because I'm really not hearing you. Oh, way better, way better. Thank you. I hear it now. We believe that there are four issues in this case. Has there been past persecution? Is Mr. Guzman-Hernandez a member of a protected social group? Has there been government acquiescence or involvement in the torture? And is he safely able to relocate? Mr. Guzman-Hernandez was 16 years old. He was working in a field. A man came up and shot his father. The man then pointed the gun at... Isn't your real problem here the nexus to a protected ground? So perhaps you want to talk about that. Yes, Your Honor. People who resist criminal cartels in Latin America... I mean, leaving aside whether that's true, because our case law doesn't seem to recognize it much, or at least in a very discreet fashion, where's the criminal cartel? The man who had his father shot was, there's evidence that he's growing marijuana. There's no reason for him to want that land. The immigration judge says this was land that was only working for subsistence farming. There's no reason that someone would want that land if they weren't going to use it for something more lucrative. There's evidence that this man was involved with, he had a lot of money, he had trucks, he had nice houses. He had an entourage of armed guards, and he worked closely with the police officials. But there's also evidence that, and I think your client testified to this, that the reason that this man, Bartolo... Mr. Bartolo. ...wanted to engage in violence against the father was because he wanted to take over the farm, because he was, as your client said, greedy. Is that a protected ground? If your neighbor is greedy and violent, are you therefore being persecuted on a protected ground? I believe that criminals are greedy, that the cartels in Mexico are greedy. The cartels that want to take the land to grow drugs so that they can make money, so that is greed. But when it becomes criminal greed and someone resists it... Well, tell me where the resistance is in this case. At least as I read this record, there doesn't seem to be a history of either your client or his father resisting demands. Again, I'm not sure that's a social group, but I want to find out factually where the evidence is. There was a point, and my client was 16, I believe, may have been 15. Right. There was a point... So I don't expect that he did it. I'm trying to find out where his family had been resistant. I would say that my client resisted because when the police tried to put the murder on somebody else that my client did not believe had done it, he resisted that. And the police slapped him and threatened him because of that. So I think that was resistance. And then let him go. Yes. Getting back to the original question, where is the evidence? Criminal doesn't equal cartel. Where is the evidence of cartel? I think that, of course, drug cartels are hard to trace. But if someone is growing drugs in Mexico, they're selling them somewhere, and there's just a well-known fact. So we're supposed to take judicial notice of the fact that all growers of marijuana in Mexico are members of cartels? I think in this case there's a little bit more than that because of the connection with the police. Well, but criminals are corrupt and police are corrupt, I suppose. So the question is, this record even doesn't have your client saying that the Bartolo was a member of a cartel, does it? He believes that he was. He doesn't say for sure. Well, yeah. I'm trying to find any evidence in this record that the murderer was a cartel member. The evidence is my client's testimony that he had all the signs, the outward appearances of a cartel member, the big trucks, the nice houses in a part of the world where- Where is that evidence even? It's in the- it's in the certified- it's in the transcript, Your Honor, and I can- That's okay. I can supplement the record with that later today. That's all right. It's in the transcript. It's in the transcript. But I thought basically that your client said he did it because he was greedy, this guy. He did say that, and the greed is a part of being a drug dealer, of being a cartel member. They do it for greed, for money. No doubt the cartel members can be motivated by greed. I'm still- and you can identify it for us later. I'm trying to find it also in his statement initially, and I don't find anything in there about him contending that Bartolo was a cartel member. In fact, he says he was a cousin of the applicant's father. So it's a- I guess what I'm trying to find out is what would compel the IJ to conclude that this was more than a family feud? I think the connection with the police and the show of wealth, and the fact that he went to the trouble of- if that's the right word- he shot somebody. He shot and killed someone, which is- We have a lot of cases where one family member shoots another one, and they're not necessarily cartel members. They may be. So I'm trying to- our standard is the evidence such that a reasonable finder of fact would be compelled to find differently than the IJ. I think that given what- how he's lived his life after that, he hid in Tijuana for a long time. He's come to the United States many times. Also, with regard to his testimony and his statements, he has brain damage based upon this accident that he had. Yeah, but that doesn't help us on the connection issue. In other words, I'm sure that he suffered because if you see your father killed, you'll surely suffer. The question is still can we tie that to a protected ground? I think that we have to believe. I believe in this case, and I believe that this is tied because of the other evidence, because of the fact that he wanted to take some land that wasn't necessarily productive, because of his relationship with- Well, apparently it was productive. Apparently he was growing marijuana. I'm sorry, Your Honor? I thought he was growing marijuana, and I thought he wanted it to grow. That's what he was doing on the- Right. Mr. Bartola was doing on his land, and he wanted to take my client's father's land to expand his operation. Right. So why isn't it productive? Because my client's land wasn't being used for marijuana. It wasn't, but it could be, so why wouldn't he want it? He did want it, and that's why he shot my client's husband. I understand, so what do you mean he wanted land that wasn't necessarily productive? It wasn't productive unless it's used to grow marijuana. Okay. That was what I was trying to say. Okay. If you want to reserve some time, you never do. I would. Thank you very much. Thank you. Good morning, Your Honors, and may it please the Court. Dan Shen on behalf of the United States Government. Your Honors, there are a few issues that my opposing counsel has pointed out that I'd like to address briefly as we go into the argument here. On the nexus question, that seems to be the crux of the issue in this case. Okay. Well, let's assume for a moment that it is and that it's a big problem. What about the Catt claim, which doesn't have a nexus problem? The Catt claim, Your Honor, has the issue of government acquiescence or willingness to torture. He certainly has some evidence of acquiescence. He has these police who he says were essentially trying to get him to finger somebody else who was clearly not the person, and when he didn't do it, there were consequences. Yes, Your Honor. Regarding that, this case, the petitioner was found credible, so that is significant. However, there's also the separate question of meeting his burden of proof. And in this case, he testified from the transcript that he knew that the police were friends with Bartolo and that the police brought him in, they had a suspect, and they tried to have him sign a confession regarding that suspect. But that's it. To go from there to then infer that because of those two pieces of evidence, that somehow the Mexican government, including the police, would therefore, from those two sets of facts, allow him to be tortured, that doesn't compel any reasonable fact finder to reach that conclusion. So we've got two issues on the Catt claim. Was there past torture? Yes. And I think on this record, while there was bad behavior, there probably wasn't past torture. Address his fear of future torture. Yes, Your Honor. The fact that he wasn't tortured in the past is not irrelevant, but it is significant. If they were going to torture him, I think the record does support the conclusion that they would likely have done it. Well, apparently this guy, I mean, he says this guy shot his father and aimed the gun at him, but it didn't work. Yes, Your Honor. So it was only, according to him, fortuitous that he wasn't shot. So the notion that he might be shot in the future by this person who was trying to shoot him the first time isn't that far-fetched, is it? Yes, Your Honor. But then the question is, is that person who aimed the gun at him a government actor? We're talking about the Catt claim still. And it's our position that he was there. Then the next step is whether the government was acquiescing in the notion that it was okay for this guy to try killing him because they were trying to get him to finger someone else. Yes, Your Honor. And I think for a reasonable fact finder to look at this record, what they could have concluded was the police did have a suspect and they tried to finger and capture that killer. So I think you can look at the facts two ways. I don't think we're reviewing this record de novo. We're looking at it for substantial evidence. And I think a reasonable fact finder could look at this and say the police had a suspect. They tried to get him to close the criminal case regarding the suspect, and so that would disprove the idea of acquiescence. Of what relevance are the petitioner's trips back to Mexico after this incident? Yes, Your Honor. I think there were at least a dozen trips back to Mexico, and I think it goes to his fear. So some of those instances were because he was deported. I think he's been deported at least four times from the record. I'm not entirely clear the number because he used a different alias. And I guess my question is if having returned several times, sometimes involuntarily, and not having suffered torture on those returns, does that tell us what his reasonable—it's more than reasonable—what level of fear of torture he has in this case? Yes, Your Honor. I was trying to take one step beyond to address my opposing counsel's argument because his argument will be that, well, he relocated, but he was hiding. Therefore, his fear was still reasonable, however—and because he had no control over being deported. But as Your Honor points out, he returned voluntarily also a number of those times. He wasn't only deported, and that undercuts the reasonableness of his fear and his ability to relocate within Mexico. And I think he's even there right now from what the record suggests. I think he was deported in mid-May of 2016. We can't be too sure. We can't be too sure in this case, Your Honor. But best we can tell, he did make voluntary trips back as well from this record. He testified to a dozen returns since 1999. And I think from this record, even with the different alias, only four of those were from deportation. And I know that the deportation doesn't make the case smooth. Right. But it's a strange record for us. He's been deported since 2016? Yes, Your Honor. And so we're worried about future persecution or torture with no evidence about what's happened to him since 2016? Yes, Your Honor. I don't know. There's not much we can do with that because that's the way the case comes to us. But it's sort of a strange posture, I must say. Well, the even stranger thing about this case is that they did file a stay. And a panel of this court ruled on that stay motion and found that there was no substantial likelihood of success on the merits. Yes, but those panels sometimes are comprised of people like us. So we like to have a second shot at it. Fair enough, Your Honor. But that was strange when I was reviewing this record myself when I noticed that he is actually not in the country for that reason. Your Honor, I'll just take a brief moment to address also the PTSD report. This case is indistinguishable from Goel, which we cite in our brief in a footnote. He's in detention. He's in detention, has the hearing, and then gets the PTSD report. Could he have really gotten that report while he was in detention? I mean, the condition existed, obviously. It's not a new condition. But could he have gotten the diagnosis while he was in detention? We believe so, Your Honor. How? He's been in proceedings for quite a while, and this diagnosis has been an ongoing condition since at least 1990. No, I agree that it's not a new condition. Right. I'm just wondering whether or not the fact that he was in detention bears on whether he reasonably could have obtained this evidence earlier. Your Honor, going to the Goel case, I think the petitioner, I'm not sure if the petitioner was detaining Goel, but that case was far more compelling. Didn't he get it while he was in detention? I mean, he stayed in detention, right? Yeah, he was in detention. And he got the PTSD after the decision, but while he was still in detention. Right, Your Honor. Yeah, and I'm just wondering whether or not the detention has any bearing on how quickly one is supposed to get evidence. We know that he got it. There's no showing here that I tried to do it while I was before the hearing, but afterwards. But sometimes when people are in jail, they can't produce evidence as quickly as they might otherwise. Right. But in this case, he was actually able to go for hearings. He was able to submit country reports, declarations. So I understand that. Okay. Do you think this report would have triggered or should have triggered a competency hearing anyway? I don't think so, Your Honor. What did the BIA do with it? Did it say that it was too late, or did it say it doesn't show anything anyway? It says both, Your Honor. It says it was neither material nor previously unavailable or unobtainable. So both. Again, Goel, the case was about an adverse credibility case. And the reports that he was able to submit in that case were medical reports and a polygraph test. And in both of those cases, they would have undercut the adverse credibility finding. And this Court still upheld the denial of a motion to reopen in Goel because— In this case, as I understand it, the IJ found the testimony credible. Yes, Your Honor. So, okay. So I'm just trying to figure out what the PTSD diagnosis would have added to the testimony. It may have demonstrated lack of competency, but it's hard to believe it would have added anything to the testimony. Right, Your Honor. I think the IJ did consider the severity of the harm based on the PTSD diagnosis because of his own testimony and his attorney's testimony, statements made during the hearings as well. Were there any efforts to bond him out? I know the lawyer made that point to the judge. I don't believe so. Can we get him out so we can do this, we can examine this more closely? Anything done beyond that? I don't believe so, but I think because it's a reinstatement case, I think the bond would have been pretty hard to obtain because he had been deported in the reinstatement order. These things typically happen pretty fast when there's a previous removal order and then that gets reinstated. So that's why I think he was removed fairly quickly in this particular case. If Your Honor has no other questions, I yield my time. Thank you. Sir. Just briefly, Your Honor, there were three times that we tried to bond him out and he was denied bond each time. We thought that the PTSD diagnosis was most important as evidence of past torture, not necessarily as evidence of his competency, but as past harm, that PTSD in itself is an injury. It's not like a cut or a bruise, but it's certainly an injury, and we thought that was the reason to show the PTSD diagnosis. I'm just thinking that that's an interesting way to try and prove a different kind of injury than is usually recognized by the persecution cases, but in fact the persecution cases seem very hard-nosed about the fact that there needs to be some physical injury. I think the IJ even quoted a case, Lim, the INS, and he quoted it, when threats are so menacing as to cause significant actual suffering or harm. And PTSD is that. Well, I mean, there's no doubt here that watching your father get killed can upset you very badly. Yes. But there's just other problems. That's the problem. This is a very difficult case for all of us, Your Honor. You know, there are just many gaps in our asylum law, and that's the problem. All right. Thank you very much. Thank you both for your argument. Guzman-Hernandez v. Sessions is submitted. We'll go on to United States v. Valdivino.
judges: Berzon, Hurwitz, Dearie